**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BOOMER DEVELOPMENT, LLC, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No.: 16-2225 (RC) |
| | : | |
| v. | : | Re Document No.: 54 |
| | : | |
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### DENYING DEFENDANT'S MOTION TO DISMISS

## I. INTRODUCTION

In 2013, the National Association of Home Builders of the United States ("NAHB") allegedly joined forces with North Star Finance LLC to offer a unique loan program to NAHB members. Under the program, members pursuing development projects were offered non-recourse debt financing of up to ten million dollars at attractive interest rates and with other favorable terms. But the deal ultimately proved too good to be true. The financing never materialized, and the program turned out to be a fraudulent investment scheme carried out by North Star.

Plaintiffs in this case are ten real estate development companies who have filed suit against NAHB, alleging that misrepresentations made by NAHB officials induced them into applying to the North Star program and paying large application fees that they never got back. Presently before the Court is NAHB's motion to dismiss the claims brought by one of those ten plaintiffs, Bloomfield Construction, Inc. In previously dismissing Bloomfield's claims without prejudice, the Court noted that Bloomfield is different from the other Plaintiffs because it did not

initially hear about the North Star program directly from an NAHB representative. Instead, Bloomfield learned of NAHB's alleged misrepresentations through intermediaries. This is not necessarily fatal, as the Court explained in its prior opinion. But it means that Bloomfield must plead specific facts that allow the Court to infer that NAHB intended to influence Bloomfield or other third parties when it made the misrepresentations. According to NAHB, the latest iteration of the complaint still does not permit such an inference. The Court disagrees, however, and concludes that Bloomfield's new allegations are just enough to pass muster. The Court therefore denies NAHB's motion.

## II. BACKGROUND[1]

As the Court has already explained in two prior opinions, this case arises out of an agreement between NAHB and North Star to offer a financing program for current and prospective NAHB members. *See Boomer Dev. LLC v. Nat'l Ass'n of Home Builders (Boomer I)*, 258 F. Supp. 3d 1, 6 (D.D.C. 2017); *Boomer Dev. LLC v. Nat'l Ass'n of Home Builders (Boomer II)*, 325 F.R.D. 6, 10–11 (D.D.C. 2018). Under this program, members would be offered non-recourse debt financing of up to ten million dollars with favorable terms and at interest rates that were at or below available market rates. Second Amended Complaint ¶ 12, ECF No. 53.

NAHB first announced the North Star program in February 2014 at its annual Home Builders Show in Las Vegas. *Id.* ¶ 13. Throughout the show, the program was touted by various prominent NAHB representatives, including Rick Judson, Chairman of NAHB's Board of Directors, and Thomas Vetter, a member of NAHB's Executive Board. *Id.* ¶¶ 14–15. Judson,

[1] At the motion to dismiss stage, the Court accepts the plaintiff's factual allegations as true. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).

Vetter, and others told attendees that the North Star program was an "NAHB program" available only to NAHB members and that those who were interested in applying should provide their contact information to NAHB personnel. *Id.* ¶¶ 16–17. They also informed attendees that NAHB and North Star planned to enter into an "affinity" program under which NAHB would receive a share of the application fees that loan applicants paid to North Star. *Id.* ¶ 18.

After the Builders Show, NAHB provided information about the North Star program to its state and local affiliates and recommended that they refer any interested parties to NAHB for additional details. *Id.* ¶ 23. When interested parties contacted NAHB, it would offer information about the program and explain to them how to apply. *Id.* ¶ 25. It would also, Plaintiffs allege, provide certain assurances about the program. *Id.* According to Plaintiffs, multiple senior NAHB officers and directors, including Judson and Vetter, told them that NAHB had vetted North Star and considered both it and the loan program to be sound. *Id.* ¶¶ 35, 45, 48, 51, 55, 58, 69, 72, 83, 91, 103, 121–23, 148, 153, 162–63, 175, 188. In reliance on these assurances, Plaintiffs decided to apply for the loan program—and in doing so, paid large application fees to North Star and an associated firm called Capital Source Funding. *Id.* ¶¶ 22, 42, 46, 70–71, 81, 86, 88, 105–06, 126, 132, 154–55, 157, 166, 170, 176, 187, 189.

The North Star financing never materialized, however, and Plaintiffs never got their money back. *See id.* ¶ 30. According to Plaintiffs' complaint, "Vetter had a financial interest in North Star and was being compensated from the fees paid by loan applicants." *Id.* ¶ 26. In May 2015, the Securities and Exchange Commission filed a lawsuit against Vetter, North Star Finance LLC, and others that alleged that the loan program was actually an investment scam. *Id.* ¶ 30. With that proceeding ongoing, Plaintiffs focused their attention on NAHB. Plaintiffs now believe that the numerous assurances NAHB officials made regarding the North Star program

were all false: NAHB never actually took any reasonable steps to independently confirm the merits of the North Star program, the qualifications of North Star's officers, or the accuracy of North Star's representations about the program. *Id.* ¶ 27. In June 2016, Plaintiffs filed this lawsuit against NAHB, asserting claims of fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duties, and fraudulent inducement. *Boomer I*, 258 F. Supp. 3d at 7. The Court then dismissed most of Plaintiffs' claims but granted them leave to amend. *See generally id.* After Plaintiffs filed an amended complaint that reasserted their fraudulent and negligent misrepresentation claims, NAHB filed a second motion to dismiss, which the Court denied with respect to all of the Plaintiffs except one: Bloomfield Construction, Inc. *See generally Boomer II*, 325 F.R.D. 6.

In dismissing both of Bloomfield's misrepresentation claims, the Court explained that there were doubts about NAHB's involvement in misleading Bloomfield, because Bloomfield had alleged that it had learned about the North Star program, not from NAHB officers directly, but from a real estate financial adviser that Bloomfield shared with one if its co-Plaintiffs, Biltmore Development, LLC. *See id.* at 13. The financial adviser, the first amended complaint alleged, spoke to Thomas Vetter, who made "certain alleged misrepresentations concerning due diligence of North Star, and those representations were then conveyed to Bloomfield." *Id.* at 14. That the financial adviser served as an intermediary between NAHB and Bloomfield was "not necessarily fatal to Bloomfield's claims," the Court reasoned, but it meant that Bloomfield had to plead specific facts that would allow the Court to infer that NAHB intended to influence Bloomfield or other third parties when it made the misrepresentations. *Id.* at 14–15. And the first amended complaint did not plead such facts. It provided "little context in which to understand the circumstances of the alleged misstatements," so there was "no basis to infer that

. . . Vetter intended or reasonably expected his statements [to the financial adviser] to be relayed to potential North Star applicants." *Id.* at 14.

The Court dismissed Bloomfield's claims without prejudice, though, and said that "Bloomfield should be given one final chance" to construct an adequate pleading. *Id.* at 15. Bloomfield subsequently filed a second amended complaint, which provides a slightly different recounting of the events. The current version explains that Bloomfield's financial adviser—Jan Reese—first learned of the North Star program, not from Vetter or another NAHB representative, but from David Stollman, a representative of co-Plaintiff Biltmore Development. Stollman, the second amended complaint alleges, reached out to NAHB in February 2014 "to inquire about leads for possible construction financing" and was advised that "the person to contact for the NAHB was Tom Vetter." Second Amended Complaint, ¶¶ 137, 140. Over the course of the next few weeks, Stollman and Vetter spoke on the phone a number of times. *Id.* ¶ 144. During those calls, Vetter told Stollman that he and "legal counsel for the NAHB had done background checks on the principals of North Star and that the NAHB was satisfied that the loans were sound and that North Star had closed several loans under a similar program." *Id.* ¶ 148.

According to the current complaint, Stollman believed from these calls that NAHB intended that the North Star information be disseminated to other builders. *Id.* ¶ 145. So as the calls were ongoing, Stollman shared what he had learned with Jan Reese, his financial adviser, who in turn passed the information along to another one of his clients, William Hasey of Bloomfield. *Id.* ¶ 147, 152. Upon hearing of the program and Vetter's assurances, Hasey arranged for Bloomfield to join NAHB so that it would qualify for the program, and then submitted a loan application and application payment to North Star. *See id.* ¶ 152. Hasey would

not have applied for the program, the complaint alleges, "in the absence of the assurances and support provided by" Vetter and NAHB. *Id.* ¶ 155.

NAHB responded to Bloomfield's second amended complaint by filing another motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), in which it argues that "Bloomfield's allegations remain entirely devoid of any alleged specific misrepresentations made to it by NAHB" and that those allegations provide no basis to infer that NAHB meant to influence Bloomfield or other third parties. Def.'s Mem. in Support of Mot. to Dismiss at 9 ("Mot. to Dismiss"), ECF No. 54-1. NAHB therefore requests that the Court dismiss both of Bloomfield's misrepresentation claims again—this time with prejudice.

## III. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits, but instead whether a plaintiff has properly stated a claim. *See, e.g.*, *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). When considering such a motion, the Court accepts the complaint's factual allegations as true and construes them liberally in the plaintiff's favor. *See, e.g.*, *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). "To survive a motion to dismiss, [the] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, the factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient. *Iqbal*, 556 U.S. at 678. The Court need not accept legal

conclusions as true, *see id.*, nor must it presume the veracity of legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555.

In cases like this one, where a plaintiff asserts a claim involving fraud or negligent misrepresentation, the complaint must also "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see Jacobson v. Hofgard*, 168 F. Supp. 187, 206 (D.D.C. 2016); *Jefferson v. Collins*, 905 F. Supp. 2d 269, 286 (D.D.C. 2012). Under this heightened pleading standard, the complaint must "state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994)); *see also Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 49 (D.D.C. 2017). And it must "identify [the] individuals allegedly involved in the fraud." *Martin-Baker Aircraft*, 389 F.3d at 1256.

Rule 9(b) does not, however, override Rule 8's general dictate that the complaint contain a "short and plain statement of the claim" and that "[e]ach allegation . . . be simple, concise, and direct." Fed. R. Civ. P. 8(a)(2), (d)(1); *see also United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1386 (D.C. Cir. 1981). Rule 9(b) merely requires that plaintiffs provide a higher degree of notice by alleging all of the requisite elements for the cause of action invoked. *Alicke v. MCI Commc'ns Corp.*, 111 F.3d 909, 912 (D.C. Cir. 1997). Indeed, "the point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process." *United States ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015). The rule "does not inflexibly dictate adherence to a preordained checklist of 'must have' allegations." *Id.* Thus, "[c]ourts must not

rigidly apply the requirements of Rule 9(b), but rather should analyze the Rule on a case by case basis." *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011).

## IV. ANALYSIS

Like the other nine Plaintiffs, Bloomfield asserts two claims in this case. The first is a claim of fraudulent misrepresentation, which, under D.C. law, requires a plaintiff to allege: "(1) that a false representation was made, (2) in reference to a material fact, (3) with knowledge of its falsity, (4) with intent to deceive, and (5) action taken in detrimental reliance upon the representation."[2] *Sibley v. St. Albans Sch.*, 134 A.3d 789, 808–09 (D.C. 2016). The second is a claim of negligent misrepresentation, for which the elements are the same, "except a negligent misrepresentation claim does not include the state of mind requirements of fraud." *Regan v. Spicer HB, LLC*, 134 F. Supp. 3d 21, 38 (D.D.C. 2015).

In its motion to dismiss, NAHB does not appear to take issue with any of these elements in particular. Instead, NAHB continues to emphasize that "[n]o [mis]representations are alleged to have been made directly to Bloomfield." Mot. to Dismiss at 7. And NAHB argues that Bloomfield's allegations concerning Thomas Vetter's allegedly false statements made to David Stollman—a representative of another Plaintiff, Biltmore Development—are too vague and imprecise to support misrepresentation claims on behalf of Bloomfield. *Id.* at 7, 11. As the Court said in one of its prior opinions in this case, "the maker of material misrepresentations may be held liable for losses incurred by third parties who reasonably rely on those representations, so long as the third party falls within an identifiable class of persons that the defendant intended to influence." *Boomer II*, 325 F.R.D. at 14. The question here, then, is whether the second

[2] The Court previously determined that D.C. law would govern Plaintiffs' misrepresentation claims. *See Boomer I*, 258 F. Supp. 3d at 9–12.

amended complaint provides context from which one can infer that "Vetter intended or reasonably expected his statements to be relayed to potential North Star applicants," such as Bloomfield. *Id.*

The Court concludes that the current complaint provides just enough context to allow such an inference. Critically, Bloomfield has now clarified that Vetter did not make the alleged misrepresentations directly to Bloomfield's financial adviser, Jan Reese. Instead, Bloomfield now claims that Vetter made the false statements to David Stollman, who passed the information onto Reese, who in turn shared the information with Bloomfield. Admittedly, this narrative adds another link to the chain of communications—a link that was not present in Bloomfield's first amended complaint. But, perhaps counterintuitively, that additional link helps Bloomfield here. One of the main problems with the first amended complaint was that the Court could not tell whether Vetter was even marketing the North Star program to a potential applicant when he made the alleged misrepresentations. That version of the complaint merely provided that Vetter had some kind of conversation with a mysterious financial advisor, during which he told that advisor some false things. There was no context from which the Court could infer that Vetter intended to use that conversation to influence potential North Star applicants like Bloomfield. *See Boomer II*, 325 F.R.D. at 14 ("[I]t is not alleged that Mr. Vetter knew that the advisor was inquiring on behalf of others nor is there any other context from which to infer that Mr. Vetter intended or reasonably expected his statements to be relayed to potential North Star applicants.").

The second amended complaint solves this issue. It now alleges that Vetter was actually having a conversation with a potential applicant to the loan program—Stollman—when he made the alleged misrepresentations. According to the current complaint, Stollman reached out to

Vetter after being referred by another NAHB official, and the two subsequently had multiple phone calls during which they "discussed the NAHB's roll out of the program as well as the North Star company." Second Amended Complaint ¶ 144. At the time of these conversations, Stollman was acting on behalf of Biltmore Development, an NAHB member—which it is reasonable to infer Vetter either knew or should have known. *See* ¶ 115. Thus, unlike in the first amended complaint, Bloomfield has now alleged that Vetter was intending to influence at least one potential North Star applicant when he made the alleged misrepresentations; he at a minimum wanted to convince Biltmore to apply.

Of course, Bloomfield must do more to survive NAHB's motion to dismiss; it must plead allegations sufficient to infer that Vetter expected to influence potential applicants other than Biltmore. The second amended complaint is adequate in this respect as well. As an initial matter, the Court is unable to discern any reason why Vetter would have wanted his North Star sales pitch to be kept a secret. To the contrary, given that the North Star program was designed solely for NAHB members, one can easily infer that Vetter would want information about the program to be shared with other members and potential new members. Again, with the previous version of the complaint, it was unclear whether Vetter was marketing the program at all when he made the allegedly false statements to the mysterious financial adviser. But now that the complaint alleges that Vetter was trying to actively sell someone on the program when he made the statements at issue, it is difficult to see why he would have been opposed to his statements being shared with other potential applicants. Indeed, taking the allegations in the complaint as true, Vetter stood to financially benefit if additional applications were submitted, as he "was being compensated from the fees paid by loan applicants." Second Amended Complaint ¶ 26. The same goes for NAHB, which, under the supposed "affinity" program, was to receive a share

of the application fees. *Id.* ¶ 18. And anyone who wanted to apply would need to become an NAHB member if they were not already one, so NAHB would also potentially receive increased membership dues. *See id.* ¶ 17. Thus, based on the nature of the conversations described in the second amended complaint, it is reasonable to infer that NAHB and Vetter wanted Stollman to share the North Star information with other prospective applicants—prospective applicants like Bloomfield.

If that were not enough, though, the current complaint also alleges that "[b]ased on his interactions with Mr. Vetter, Mr. Stollman believes that Mr. Vetter and the NAHB intended that the North Star information be disseminated in this manner." *Id.* ¶ 146. This is no legal conclusion that the Court may simply discard when considering a motion to dismiss. It is an allegation of fact—one that can be probed and tested during discovery and at trial. And taking the allegation as true, that Stollman understood the tenor of his conversations with Vetter to mean he should share the North Star information with other prospective applicants would be valuable evidence in showing that Vetter reasonably expected to influence third parties like Bloomfield.

Finally, unlike the previous versions of the complaint, Bloomfield's allegations in the present iteration of the complaint satisfy Rule 9(b)'s particularity requirement by "stat[ing] the time, place and content of the false misrepresentations." *Martin-Baker Aircraft Co.*, 389 F.3d at 1256 (quoting *Kowal*, 16 F.3d at 1278). The complaint now makes clear that Vetter's alleged false statements were made in phone calls with Stollman that began between February 20 and February 27, 2014 and "continued into the early weeks of March 2014." Second Amended Complaint ¶ 144. The statements were then relayed to Bloomfield, through Jan Reese, "between February 24, 2014 and March 17, 2014." *Id.* ¶ 152. The Court previously held that time ranges

similar to these were sufficient for Biltmore to survive a motion to dismiss. *See Boomer II*, 325 F.R.D. at 17. There is no reason to treat Bloomfield any differently.[3]

The same rationale applies to the content of Vetter's false statements. The Court already okayed Biltmore's allegation that Vetter said that "he and others at NAHB had spent months tailoring the North Star program to the needs of NAHB members and that the NAHB had performed background checks on North Star and were satisfied that the loan program was sound and that North Star had closed several loans under a similar program." *Id.* Bloomfield now alleges that these exact statements were relayed to it. *See* Second Amended Complaint ¶ 148. Just as the Court held with respect to Biltmore, then, Bloomfield's allegations now afford "NAHB an adequate opportunity to prepare a defense." *Boomer II*, 325 F.R.D. at 17. The Court therefore concludes that Bloomfield has properly stated a claim for both fraudulent misrepresentation and negligent misrepresentation.[4]

---

[3] NAHB appears to suggest that the time ranges asserted by Biltmore may be inconsistent with those now asserted by Bloomfield. *See* Mot. to Dismiss at 8–9. But this argument seems to be based on an apparent typo in the complaint. In the section of the complaint containing Biltmore's factual allegations, one paragraph states that Stollman spoke to Vetter "prior to February 7, 2014." Second Amended Complaint ¶ 119. However, when this paragraph is read in the context of the surrounding allegations, it becomes clear that the paragraph should read "prior to February *27*, 2014." *See id.* ¶ 116 ("On or about February 20, 2014, Mr. Stollman received an email with three attachments from the local HBA, along with contact information for Tom Vetter."); *id.* ¶ 126 ("Biltmore filed its first loan application with North Star on February 27, 2014 . . . .").

[4] Like the other nine Plaintiffs, Bloomfield has asserted only one count of fraudulent misrepresentation and one count of negligent misrepresentation. Because the Court here concludes that Bloomfield's allegations with respect to its first North Star application are, on their own, sufficient to support each of those claims, the Court need not address Bloomfield's allegations with respect to its second North Star application for purposes of NAHB's motion to dismiss.

## V. CONCLUSION

For the foregoing reasons, NAHB's motion to dismiss is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: February 14, 2019

RUDOLPH CONTRERAS
United States District Judge